**Donald Lee COUSINS**

v.

**R. M. OLIVER, Superintendent of the Virginia State Farm.**

**Civ. A. No. 73–480–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Jan. 14, 1974.

Donald Lee Cousins, pro se.

William A. Carter, III, Asst. Atty. Gen., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, a Virginia prisoner incarcerated at the State Farm Southside, alleges constitutional deprivations by the defendant penal authorities for which he seeks monetary and injunctive relief.

Jurisdiction is attained pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343. The parties are presently before the Court pursuant to the defendant's motion for summary judgment and the matter is ripe for disposition.

The uncontroverted facts are as follows:

The plaintiff is a recidivist who has violated two previous paroles and is currently serving a term for statutory burglary committed while on parole.

On June 3, 1973, while a resident of the State Farm, Northside, he was charged with and admitted engaging in homosexual behavior, in violation of prison regulations. In a hearing held on June 5, 1973, an Institutional Adjustment Committee sentenced the plaintiff

to 15 days in isolation and recommended a loss of 20 days good time. The Adjustment Committee also referred the plaintiff to the Institutional Classification Committee (ICC) for possible security reclassification.

Also on June 3, 1973, while being searched pursuant to being placed on detention because of the homosexual behavior charge, a guard reported finding a sharpened kitchen knife and a sharpened nail file on plaintiff's person. Disciplinary charges were also brought against the plaintiff for the possession of weapons and plaintiff again admitted to the charges. At the hearing held on June 5, 1973, the prison Adjustment Committee sentenced the plaintiff to a loss of 30 days good conduct time on this charge and referred the plaintiff to the ICC for possible security reclassification.

On June 19, 1973, the ICC, apparently without a hearing, conducted a general review of the plaintiff's record. In addition to the violations already discussed, plaintiff's record included reports of four other occasions on which plaintiff had been found guilty of rule violations by an Adjustment Committee and one occasion on which charges had been brought and dismissed after hearing. Reportedly because of this pattern of incorrigible behavior, the ICC assigned the plaintiff to maximum security.[1]

On June 26, 1973, the plaintiff's case was again reviewed by the ICC because of plaintiff's representations that there was friction between himself and another inmate, W. Pleasants, who was also housed in the maximum security building. As a result the plaintiff was placed on padlock status.[2] This was purportedly for plaintiff's own protection. On September 21, 1973, shortly after the plaintiff's antagonist, Pleasants, had been transferred to another penal facility, the plaintiff was taken off padlock status.

The gravamen of plaintiff's complaint is the following:

1.  That his removal from the general population and placement on maximum security was arbitrary and/or punitive.

2.  The fact that the ICC decision to place him in maximum security was based on incidents for which he had already been punished by the Adjustment Committee resulted in his being twice jeopardized for the same offenses.

3.  The fact that the ICC action taken was without a hearing denied him of due process.

4.  The decision to place him on padlock status for part of the time he was housed in the maximum security building was arbitrary and capricious.

Before proceeding with the analysis of plaintiff's claims, the Court would make the following observations regarding the Virginia system of penal administration. The function of dealing with inmate behavioral problems is split between the Institutional Adjustment Committees and the Institutional Classification Committees (ICC) at the various state penal institutions.

When an inmate is reported for misbehavior and disciplinary charges are brought against him, an Adjustment Committee hearing is held to determine the fact of guilt or innocence and, assuming a finding of guilt, the Adjustment Committee determines the appropriate disciplinary action to be taken.[3] Previous decisions by this Court have recognized the penal nature of Adjustment Committee actions and have estab-

---

1.  Maximum security is a condition of confinement whereby a prisoner is subjected to greater supervision and his movements are more restricted than is the case for prisoners enjoying a higher security status and released to the general population.

2.  Padlock status is a condition of confinement, more stringent than maximum securi-

ty, whereby a prisoner remains in his cell at all times, save minimal periods of exercise and for sanitary purposes.

3.  Of course, alleged misconduct which is violative of the state criminal laws as well as institutional rules may result in criminal charges being prosecuted in the state courts in lieu of administrative disciplinary action.

lished specific procedural requirements with respect to such actions. See *e. g.*, Landman v. Royster, 333 F.Supp. 620 (E.D.Va.1971).

An inmate's misconduct may also serve as the basis for a security reclassification by an ICC, whether or not disciplinary proceedings or criminal charges have also been brought against the inmate for the same misconduct. The theory is that such proceedings are not punitive in nature, but are used to determine the appropriate security classification for an inmate whose alleged behavior has raised a question regarding his trustworthiness. Previous decisions by this Court have recognized the theoretical non-punitive nature of ICC proceedings and have developed more flexible precedural requirements with respect to such proceedings than with respect to disciplinary proceedings by an Adjustment Committee. See *e. g.*, Wesson v. Moore, 365 F.Supp. 1262 at p. 1266 n. 8, (E.D.Va.1973). Also relying on the theoretical non-punitive nature of ICC proceedings, previous decisions by this Court have dismissed the suggestion that disciplinary action by an Adjustment Committee, followed by an ICC security reclassification based on the same misconduct, might raise double jeopardy problems. See, *e. g.*, Almanza v. Oliver, 368 F.Supp. 981 at p. 984 n. 3, (E.D.Va.1973). It goes almost without saying, however, that an ICC proceeding found to be punitive, *in fact*, will be tested against the same due process standards applicable to an Adjustment Committee disciplinary proceeding. *Cf.* Ferrell v. Huffman, 350 F. Supp. 164 (E.D.Va.1972).

Regarding the procedures employed by an ICC in making a security reclassification determination, the administrative regulations clearly provide for an infor-

mal evidentiary hearing where there has been no previous inquiry into the inmate's factual guilt or innocence by an Adjustment Committee in a disciplinary proceeding.[4] However, where the fact of the inmate's guilt has previously been determined by an Adjustment Committee in connection with a disciplinary proceeding, the regulations apparently do not provide for any hearing before the ICC at which the inmate is permitted to attend and participate.[5]

Assuming that the responsible penal officials had applied appropriate procedures with respect to the action taken against the plaintiff, the Court would have little hesitancy in dismissing his substantive claims, numbered one, two and four above. With respect to the plaintiff's first numbered claim, his record of incorrigible behavior was clearly such as to raise a legitimate concern as to institutional security; and the action taken (placement in maximum security) was such as could reasonably have been calculated to remedy the problems envisioned. See Wesson v. Moore, *supra*, 365 F.Supp. 1262, at p. 1266 n. 7, (E.D.Va.1973). *Cf.* Cary v. Slayton, mem. decis., C.A. No. 565–72–R Jan. 1, 1973 (E.D.Va.). With respect to the plaintiff's second numbered claim, as already noted above, previous decisions by this Court make clear that behavior which has been subject to criminal prosecution or to institutional disciplinary action may also serve as the basis for an independent ICC security reclassification without raising double jeopardy problems. See Wesson v. Moore, *supra*, 365 F.Supp. 1262 at p. 1266 n. 8, (E.D.Va.1973) and Almanza v. Oliver, *supra*, 368 F.Supp. 981, (E.D. Va.1973). Finally, with respect to the plaintiff's fourth numbered claim, the concern which he, himself, expressed as

---

4. This may result where disciplinary charges have not been brought against the inmate for his alleged misconduct, as penal officials are apparently given discretion to decide whether or not the bringing of disciplinary charges would be appropriate in an individual case.

5. At least, this is what the plaintiff has alleged and, in the absence of a contrary indication in the record, will for the purposes of the pending motion be presumed to be factual.

to the danger of contact with a fellow prisoner housed in the same general area was sufficient to raise concern by the ICC regarding the plaintiff's personal security, and to justify his separation from that inmate under padlock. See Wesson v. Moore, *supra,* 365 F.Supp. 1262 at p. 1266 n. 7, (E.D.Va.1973). *Cf.* Armstrong v. Oliver, mem. decis. C.A. No. 279–73–R, July 5, 1973 (E.D.Va.).

■ The difficulty which the Court has with the instant issue is that the plaintiff was apparently not given a hearing before the ICC at the time it was decided to place him in maximum security.[6] It is true that the plaintiff had already been given an opportunity, in his various Adjustment Committee hearings, to establish that he had not, in fact, committed the acts of which he had been accused.[7] The Court does not intend to suggest that an inmate in plaintiff's position should be given still an additional opportunity to challenge the fact of his guilt. However, the division of functional responsibility, within the Virginia system of penal administration, between Institutional Adjustment Committees and Institutional Classification Committees (ICC) presupposes that the relevant inquiry by each of these bodies is different from the other.[8] It may be, therefore, that there would be matters which an inmate in plaintiff's position would want to raise before the ICC, but which had not been raised before the Adjustment Committee.

■ A refusal by an administrative body to consider all factors properly before it and relevant to a decision at hand is arbitrary and capricious action. See Chicago Junction Case, 264 U.S. 258, 265, 44 S.Ct. 317, 68 L.Ed. 667 (1924); Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 80 L.Ed. 1288 (1935); S. D. Warren Co. v. NLRB, 342 F.2d 814, 816 (1st Cir. 1965). In a similar vein, due process requires that an administrative body, acting in an adjudicatory capacity and about to embark on a decision, afford to persons to be affected by the impending decision the opportunity to present any matters relevant to its determination. See Ohio Bell Telephone Co. v. Public Utilities Comm'n of Ohio, 301 U.S. 292, 300, 304, 57 S.Ct. 724, 81 L.Ed. 1093 (1936). Therefore, in order that the ICC might properly consider matters peculiarly within its competence to consider, an inmate in plaintiff's position should, in the absence of compelling reasons not appearing in the present record, be given the opportunity to present to the ICC additional facts and arguments which may have been irrelevant to the proceedings already held before the Adjustment Committee.

The Court is fully aware that the plaintiff in this case has a lengthy record of misbehavior within the prison system. The Court is also aware that the serious nature of some of plaintiff's misconduct makes it unlikely that the ICC would have reached a contrary decision regarding his security classification even upon a hearing in which the plaintiff would have been permitted to participate. Nevertheless, the question here is not as to the substantive results reached by the ICC. Rather, the question is whether the procedures employed by the ICC in reaching the results in this case, and others, comport with the requi-

6. Again, this is what the plaintiff has alleged, and will be presumed factual for the purposes of this motion. It is, of course, open to the defendants to show otherwise.

7. The plaintiff had actually admitted, in his prior Adjustment Committee hearings, to some of the acts of which he had been accused.

8. Presumably, guilt alone would be sufficient to warrant disciplinary action by an Adjust-

ment Committee, although, hopefully, that body would also consider mitigating circumstances in deciding upon the punishment to be imposed. On the other hand, it is presumably the function of an ICC to consider the nature of the misconduct relative to over-all security measures within the penal institution. It is also fair to assume that mitigating circumstances would have a different significance with respect to ICC determinations than with respect to Adjustment Committee decisions.

**558**

sites of due process. To the extent previously outlined, the Court concludes at this stage of the proceedings that they do not. Therefore, the defendant's motion for summary judgment will be denied.

It remains open for the defendant, of course, to demonstrate to the Court compelling reasons, if any there be, why an ICC hearing, in cases such as this, would be unduly burdensome on the State and why alternative procedures should suffice.

An appropriate order shall issue.